The next matter on the calendar, Moses v. Isaacson, 21-2556, Moses and the New York Times Company versus Isaacson. Good morning. What is a coupon, Mr. Isaacson? I think that we clearly have coupons here by the dictionary definition. You have coupons also by the online DVD definition that the Ninth Circuit has adopted and that several judges of the Ninth Circuit have indicated is a bad standard because it's not objective. It's a multi-factor balancing. But even if you apply online DVD, the access codes in this case are not cash equivalents. They're not close to it. They can't be used to extend an existing subscription or pay for part of an existing subscription. At the Fairness Hearing, class counsel said that many class members are existing New York Times subscribers and for them, this is as good as cash. Well, it's not as good as cash. It can't be used for the existing subscriptions. Right. The only thing we know that the class members actually want from the New York Times, they can't get with these coupons.  And as someone who subscribes to the New York Times, I get bombarded with emails asking me to subscribe to the athletic, which is tempting, and to the cooking and whatever the other thing is that's in this settlement. So I'm well aware that I could get those things and I don't. I imagine that that's true of a lot of the class members, that they just don't – they already know that they don't want the things that are the only things they can buy with these coupons. I think that's absolutely true, Your Honor. I would urge the court to hold their coupons subject to CAFA, which means that the attorney's fees can be – which means that they can't be valued at $3.9 million in terms of evaluating the worth of the settlement. And it also means that they can't be valued at $3.9 million for purposes of attorney's fees. CAFA is very clear that you can only pay attorney's fees based on coupons that are redeemed. And we don't know how many coupons are going to be redeemed. If you were to use the framework that the Ninth Circuit has developed, and I think also the Fourth Circuit, Sixth Circuit, a few other circuits, would you be able to prevail on this coupon? I think so, Your Honor. Tell me about that. I think that other circuits that have referenced online DVD have referenced it as one of several standards in lumber liquidators, for example, the Fourth Circuit opinion. Fourth Circuit opinion says, well, if you look at the dictionary, they're coupons. It says if you look at the online DVD, Ninth Circuit standard, they're coupons. So you've got a court that is saying however you approach it, they are coupons. I don't think the Fourth Circuit has rejected the broad definitions that we have in ordinary English language regarding coupons. The Fourth Circuit has said that whatever the standard we want to apply, or would ultimately apply in this case, they constitute coupons. I think that's true here, too. The district court held that because they don't require class members to hand over more money to the New York Times, they're not coupons. Well, that only addresses the first of several factors that are identified in online DVD. DVD, the class council insists that it's an entire product. Well, one month is not an entire subscription. So I don't think it's an entire product. You get one month of a new subscription that you can then, if you want, renew and pay for. So it flunks the first factor on online DVD. Second factor on online DVD is whether it's only for select products. In online DVD, we're talking about Walmart gift cards that were redeemable for thousands and thousands of household products that Walmart carries. It wasn't limited to one thing. Here, you've got a limitation that says, oh, you get a free month of the New York Times, but if you're a subscriber, as most class members are, you can't use it on your existing subscription. You can use it for New York Times cooking or New York Times games to get a one month. I mean, that's the crossword. But you can also get cash as an alternative. Well, 1.2 percent of the class asks for cash, filed claims for cash. That is not an overwhelming response. But if you're going to be valuing the settlement based on cash, you ought to be looking at the cash common fund. You ought not be looking at the coupons. Coupons are not worth cash and not valued as cash, quite frankly. It seems to me you have actually three arguments, don't you? You have argument number one. This is a coupon by the dictionary definition, and that's what we should apply. Argument number two is even if you apply the Ninth Circuit test, it's still not a coupon because it's transferable. But there's no real reason to think there is ever going to be a secondary market for these coupons, among other problems with meeting the Ninth Circuit test. And argument number three may be even if it's not a coupon and you don't go directly to the cataway of evaluating attorney's fees, there's a serious problem with treating these things as the full equivalent of cash when you're assessing the value of the settlement, which is the way in which the attorney's fee, for example, is really validated as a sort of contingency. So I know all of these problems adhere in this settlement, I take it. Absolutely, Your Honor. And on the third point, I think the Seventh Circuit in the case dealing with envelopes, DHL, I think was the name of the case, says even if they're not technically coupons, they can't be valued, can't deem them to be worth the face value. Can you help me out with what would actually happen, in your view, if we applied the CAFA standard? Because I'm having a little trouble understanding how that is administered. If we are only going to value for attorney's fee purposes those coupons that are redeemed, when do we find out when the coupons get redeemed? I mean, if people haven't – as I understand from the settlement, if somebody didn't ask for the cash, then they're going to get the coupons, or the access codes, these are virtual somethings. So then they get sent those things. When do we ever – and these things supposedly last forever. So when do we know how many of these have been redeemed so that the district court can then proceed to calculate an attorney's fees? Does the district court have to wait for some reasonable period, some indefinite period, before deciding, okay, this is how many of these things have been redeemed? I just don't understand how it works, and maybe you can help. Thank you, Your Honor. I think it would be easy enough for the district court to say the attorney's fees on the access codes should be 22.5 percent or even 25 percent. And then as they are redeemed, New York Times can cut checks to plaintiff's counsel based on the redemption. It's like a rolling attorney's fee. Yeah, it's a rolling attorney's fee. They've got accountants. Their accountants have to – I understand, but it's a somewhat strange way of doing it. It's a very difficult way to do it. Well, they're the ones who said these are good for 50 years. Of course, they could have taken their 22 percent in 22 percent of the cash and 22 percent of the access codes, and then rely on that vaunted secondary market and the transferability of the access codes to sell them for what they're worth. That's correct, Your Honor. They kind of didn't do that, huh? They did not do that. I see my time has run out. I'll ask any questions you have. Is there a form of non-cash settlement that would not qualify as a coupon? If somebody bought a defective vacuum cleaner and the class action settlement replaced the vacuum cleaner with one that's not defective. With a vacuum cleaner. Send them a vacuum cleaner. They sent a voucher and said you can go to Walmart and get a vacuum cleaner. I assume you'd say that's a coupon. Well, it looks a lot like a coupon. The fact is if it's a defective product and they give you the product, no longer defective, you could argue that's not a coupon. If they give you a voucher for the product, is that a coupon? In most instances, it would be. Really? Yes. Before you sit down, a standard of review for us. I think the standard of review as to whether it's a coupon is de novo. The Ninth Circuit has twice held that it's de novo review. The Eleventh, I think there's another circuit besides the Ninth that escapes me. I know the Eleventh Circuit held that it's de novo review in the case Drazen v. Pinto that was vacated for in-bank rehearing and therefore is not precedential. But I submit the Ninth Circuit is correct whether these are coupons is a question of law. What are we to make of the fact that the district court here during the final approval hearing, as I read it, said that the attorney's fee award was reasonable even when the fee is cross-checked against the Lodestar amount? Well, it's a cross-check that shows that the attorney's fee is almost four times their reasonable hourly billing rate. That's four times Lodestar. But am I right that under 1712A, the Lodestar amount can be a basis for an attorney's fee award? There are instances where it could be a basis for an attorney's fee award if they're not basing the attorney's fee award on the coupons. So you're suggesting that the Lodestar amount, as it is referred to in Section 1712 whatever the letters that go with it, is what the fee can be. In other words, the statute doesn't say you can give a multiple of the Lodestar or you can give a contingency fee and cross-check against the Lodestar in a coupon settlement. It says you could give the Lodestar. Is that your view? I think that's correct. And there might be instances where it would be appropriate to have a multiplier. In this case, a very modest multiplier at best. Four times the Lodestar is what Fresno County, this court's opinion in Fresno County, refers to as, I think, a wild discrepancy from the unenhanced Lodestar. What the Supreme Court has held in class action litigation is the presumptively reasonable attorney's fee. Right. But that's a separate problem. If we have a coupon here, then we have some serious problems, it seems to me, with approving the settlement at all, right? I realize that you also have arguments that the attorney's fee is unreasonable for a set of other reasons. But that does lead me to another place, which is if we find that this is a coupon settlement and thus that CAFA determines what the fee is, what happens to the settlement as a whole? In other words, you know, often we have a situation, and I think the district court kind of contemplated this. The district court said, first we decide the fairness of the settlement, then we decide on the attorney's fees. You argue that's incorrect under the new version of Rule 23E. But that is kind of how the district court did it, right or wrong. So if CAFA tells us that the fee is wrong, is not reasonable or not legally permissible, don't we then feed that back into Rule 23 and say, well, and whether the fee is excessive is an important variable in deciding whether the settlement as a whole is reasonable, and therefore have to remand with instructions to basically say no to the settlement? A, is that your position, and is that what you're asking for? Yes, I think that's correct. That is my position. There might be an alternative argument to the effect that, well, the New York Times engaged in negotiation with class counsel. They decided that the case, they would pay $1.65 million. The arm's length negotiations there suggest the possibility that $1.65 million is a reasonable amount. But, you know, 75% of that is attorney's fees. Based on a bunch of coupons is not. Knock the attorney's fee award down to 22.5% of the cash. But then you have something funny. I'm not trying to attribute this to you. I'm just trying to think through where we might go here. One thing that hypothetically could be done is to say that, well, the attorney's fee award gets calculated under CAFA. That winds up being a lot less than $1.6 million. Too bad, so sad for the attorneys. But the settlement stays. But the problem there is that only a few people asked for cash. That's correct. I don't, you know, I've looked at enough class action settlements in my time to know that a lot of people just ignore the whole thing and never make any claims at all. If suddenly the attorneys are down to a couple of hundred thousand dollars and the 10,000 people who fortuitously asked for cash, when everybody thought they'd get about 20 bucks, are now suddenly sharing, you know, over a million dollars, that doesn't seem like a very fair way of treating the class. If we're assuming that the coupons aren't worth very much and most of the people who didn't have the foresight to opt out get essentially the not worth very much coupons and the other people get a bonanza because they get the money that the attorneys thought they were getting, that doesn't seem like a very sensible outcome. As a class member who put in a claim for cash, I'd love to get a bonanza. But I cannot disagree with your analysis. I think you're right. Okay. You've reserved some time for rebuttal. Thank you very much. Hold on one second. Good morning, Your Honors. Frederick Corsica Bursar Fisher on behalf of Plaintiff Appellee. Sounds like we want to talk about coupons. So is there a specific question you would like to start with? No? So I guess I think one thing I'd like to start with is why is a one-month subscription to either cooking or games, not including therefore either, the one thing we know these people want and have bought, which is the full New York Times subscription, and the other, maybe I'm showing my own bias here, might be something like the athletic. Why is a one-month subscription to these two things? Anything at all like a Walmart gift card? Well, you've got to look at the context. So why is a one-month extra subscription? Well, New York Times sells digital subscriptions on a monthly or an annual basis, right? So we're giving, essentially, class members what we thought they were being wronged of, which is they inadvertently were charged or without their consent were charged for an extra month of subscription. But probably most of the people in the class, I mean, there are former subscribers and present subscribers in the class, right? Anybody who's a present subscriber wasn't harmed at all because they wanted to, presumably, stay subscribers indefinitely. The people who quit, I guess, are also people who, you know, I mean, most people don't care to have a one-month subscription unless they're just trying it out. But these were all people who tried it out and then abandoned it. Why are they happy to get one month of the New York Times all of a sudden? Because they're not forced to. They had the option of getting cash out of the settlement. They're not required to just take the one-month. They could ask for the cash. Of course, if they all asked for the cash, they'd get virtually nothing, right? Because you've got 800,000 people, and after the lawyers take their cut, they're sharing $400,000. That's like 50 cents a person. But that's not the world that we're living in, right? 10,500 class members. We're not living in that world. You know why we're not living in that world? Because most people probably looked at this and said, well, I don't understand this. It's a bunch of crap. Throw it away. I don't think we're talking about 10,000 people who took the money versus 800,000 people who said, oh, I don't want the money. I want the one-month subscription to something I'm probably already subscribing to. And now I can get cooking? Or games. And if you're no longer a subscriber, I think you're able to get a month of the basic subscription to the regular content. But really, the notion that this is worth the face value of the coupons. Look, it may be that not very much is the actual fair basis for a settlement of this case, because there are all kinds of obstacles to the plaintiffs winning anything at all. But that's not really the question before us anymore. The question before us now is, is this the kind of settlement that Congress was concerned about where the defendant has the option of paying off the lawyers and making them go away by giving the lawyers as much money as the defendant is prepared to pony up and giving the class something that is not really worth very much? As opposed to something that is purported to be for the purpose of deciding whether this is a reasonable attorney's fee. But I'm having a lot of trouble with, even if there weren't CAFA, just assessing the fair market value of something for which there is essentially no market is one for one what the cost of the service that the coupon is addressing would cost. So I guess a few points in response to that. With respect to the question of is this not what Congress is trying to prevent with CAFA, I think the answer is no. Congress was interested and I think intended to prevent scenarios where a coupon or a voucher was given that in order to realize the benefit of it, the class member had to spend money out of pocket. So hey, 30% off your next purchase of $100. So I have to spend $100 to get $30 back. That's not the scenario. Class members don't have to. Yeah, but that's one thing, right? That's like the signal abuse. But they didn't put that in the definition in any way. Well, they didn't put anything in the definition, did they? Right. They didn't have a definition. They just say a coupon is the problem. And there's two things that are wrong with the kind of scenario that you're talking about. One is I have to ante up more money. Right. That doesn't necessarily make the coupon worthless to me. When I was a kid, just married, I was a member of a class against Cuisinart. And I got a coupon for Cuisinart cookware. And as somebody setting up a household, that was actually valuable to me. I was glad to get it. That didn't seem very abusive just because I had to pay the money to Cuisinart. I was getting a discount. Right, because that's money you were going to spend anyway. But if I hated Cuisinart because I thought they screwed me and treated me unfairly, then I might not be happy even if it was get a free Cuisinart because I don't want to deal with them anymore. So there's a whole set of problems that Congress – when Congress says look at these terrible abuses, okay, most of the people who spoke about it focused on a particular thing. But I don't know why we would say that's the only thing that they were concerned about with coupons. I think that was the driving force behind it, which was that they were illusory. People aren't getting the – whereas the hypothetical about, well, I gave you a voucher for a new vacuum cleaner, that seems like more akin here. Like you're getting exactly what you otherwise would be paying for, which is the vacuum there. You're getting one that's functional. So that's just the mechanism. But who says you want it? Even if it's a voucher for a vacuum cleaner, it's a vacuum cleaner for the company that the last one they gave me was no good. Maybe if I got a voucher that was good for one vacuum cleaner at Walmart and I could pick out whichever one I wanted and the defendant who is culpable is not getting the benefit of that, I might feel differently about the coupon. But if it's a voucher for a vacuum from the people who sold me a defective vacuum, that doesn't seem very great to me. And here, again, we're talking about very – if you're talking about the benefit to the defendant in these things, there's a benefit that comes when the defendant gets business from the class members. That's something that would be attractive to them. I don't know if that makes it necessarily terrible, but I think that's one thing Congress had on its mind. The Times is getting something out of this because they would probably offer – they probably have offered at some point that you can get a free loss leader subscription to something that they're trying to sell because once you look at it, you'll like it, and then you'll sign up for more. That's a thing that companies do, and that's kind of what they're doing here. If you sign up for this, it's good for the Times. It's not a big cost to them to do this. It doesn't cost the defendant anything, and it doesn't benefit the plaintiffs very much, and that's the nature of the settlement in a coupon settlement. I just don't think that's the scenario. The claims rate being 10,500 people, right, means it's different than a normal class action where you have to file a claim to get relief. If you don't file a claim, you get nothing. Here, doing nothing means you still get something. The people in the class who wanted cash and didn't want a voucher or a coupon – we're going to call it an access code because that is what it is. It gives you access to the website. They could have filed a claim and got cash. We know 10,500 people in change wanted cash, and they're getting it. In fact, they're getting prorated up. It's hard to say that, well, because these other people didn't submit a claim for cash, the settlement's awful. In a typical scenario, they'd be getting absolutely nothing. The settlement was structured in a way that everybody in the class, even if they chose not to participate, are going to receive the email code. We don't have to say that the settlement is awful. The question before us is whether this is a coupon, and so whether this fits within the definition of coupon under CAFA. And I think what you're asking us to do is put some limitation on a word, coupon, that doesn't actually appear in the statute. And so maybe you're right as a matter of legislative history and what Congress intended, generally speaking, but we've got a word, coupon. Your friend started out with more or less a dictionary definition. Tell me why he's wrong about that definition. It's a broad word. I think it goes to the point that Your Honor made earlier, which is what kind of non-cash settlement is not a coupon. And it seems that almost everything is. So long as it comes printed on a piece of paper, it's a coupon no matter what. Well, this doesn't come printed on a piece of paper. We're not making that argument. No, but this comes in an email. But what I'm saying is that what transforms instead of if the company shipped you a new vacuum, it's not a coupon. But if you have to go to the store and redeem the voucher to get your new vacuum, it is somehow subtly transformed into a coupon. And I don't think that's really how it works. I'm writing an opinion. And the opinion has to include a definition of coupon. What would you have us say as a definition of coupon? I would follow the trend into circuits across the country and formally adopt the NRA DVD. No, no, no. Specifically, what would you have us say? Whether or not it's a coupon. Does it require consumers to expend additional funds in order to receive the benefit of the coupon? How long is it good for? How long can it be transferred for? And did they have the option of getting cash? And each one of those circumstances, I think, goes in favor of the settlement here because they're all answered in the affirmative. Well, that's not exactly what the Ninth Circuit said. So you're proposing something subtly different than the Ninth Circuit? I mean, I think the Ninth Circuit looks at how much money was, you know, you have to spend more money out of pocket. Do you need to, is there a restricted product availability or selection choice? And then the flexibility, which seems to envision like, okay, well, what's the length of, how long are they valid for? Like the expiration date. Are they transferable? And, you know, I guess you could say is there a cash alternative as part of flexibility? So they don't talk about could you get cash instead in the settlement as one of the criteria? One of the Ninth Circuit opinions, I believe, referenced that as a point that led them in favor of finding it to be expedited. So it's a multi-factor test. These aren't all, each of these things has to be true for it to be a coupon. I mean, I don't think there's one determinative factor as whether or not it's a coupon. Because like you said, hey, I was really happy about getting this like, you know. Well, I can be happy about it and it's still a coupon. I thought I got a coupon and I was happy about it. That's a different thing than is it a coupon. But let's go back to those three criteria. You have to put up your own money. Well, that's not so. So that's one point for you. Then it has to have or it should have or one thing we're considering is whether it has a wide variety of products. Clearly not true here. But it sort of is, right? Like you, so what? The New York Times is supposed to go out and just give people generic gift cards, right? Like they offer a handful of subscriptions and a handful of products. Yeah, but they didn't give, they didn't, unlike the Walmart case, they didn't even give a choice of anything that they offer. They restricted it to particular things that they're trying to hawk, right? Not necessarily. No, no, I don't think that's true. And I think it's for people that are subscribers. They have the New York Times. Right. If you are a class member who is a subscriber to the New York Times, you cannot get the New York Times with your coupon. Is that not right? I think you get an ancillary subscription. I thought that it does not provide that you cannot simply extend. Oh, you get another subscription. You can get like another, so like there's a core basic offering that is rather restricted. And if you are an active subscriber to that core offering, you are given the opportunity, the choice of do you want a cooking or puzzle subscription? Right, exactly, the ancillary subscription. Or do you want cash, right? So they still have, again, if you don't want the subscription, you can get cash. And I think that's that. And then if you are not a current subscriber, you have the option of signing up for the basic digital subscription that will give you full access to the New York Times. Right, except that we have two groups of people in this settlement, the people who already are subscribing, who cannot extend their New York Times subscription, which is one thing that I would guess that most of these people would do. Oh, great. I'm getting the New York Times anyway, and now I'm going to get a month for free. Good deal. But they can't get that. And that's the principal thing that the New York Times sells. They also have, do they not, other ancillary products besides cooking and games. True. Sold through their, like, under the New York Times brand? Yeah. Are you talking about, like, the athletics? Athletics, for example. I thought that was, like, a separate subscriptions plan that wouldn't be covered under any New York Times branded subscription in the first instance. And if I'm wrong on that, please. I don't know. We'll have to hear from the Times. We've got the New York Times here. Yeah, we've got the Times here. We'll hear about that. They're the ones sending me the e-mail saying to subscribe to this thing. Maybe it's just a joint branding of a separate product. I'm not getting those e-mails. I don't know. You're not getting those? I don't know why. You got on the good list. But let me go back. What that rule came from in the Ninth Circuit's view, I mean, the case they were deciding was about a Walmart gift card that can be redeemed for anything that Walmart sells, which is a huge amount of stuff. It seems to me, if I'm asking myself, is this like the equivalent of cash? Am I valuing a $12 Walmart gift card as is it worth $12? I mean, I may have a little inconvenience to have to give it to somebody else or find somebody else who wants it, or I can't find anything at Walmart I would want to buy. It's pretty close to $12. I'm having a lot of trouble seeing the same thing of something that does not even offer everything that the defendant has on offer, which already is a rather restricted list of products. But that's that. Then they have this thing about flexibility. And I think, again, you go back and you look at the Walmart gift card, and I understand why the Ninth Circuit said what it said, because this is pretty readily transferable. There are a zillion Walmart stores. Most Americans live within easy driving distance of one. And if you don't and you have a computer, you can shop online and you can buy all these different things. And if it doesn't expire and if I really I don't like Walmart because of some I'm part of some progressive boycott of Walmart for some reason, I can give it to my grandchild or my uncle who would love to have a Walmart gift card. I could probably even sell it to somebody for $12 who lives nearer to Walmart than I do because it's worth $12. Who's going to buy this? Where is the secondary market for something like this? How does that account for the kind of flexibility that makes this look like cash? I mean, it can be given as gifts. I mean, what makes it look like cash is that there was a cash offer. I have a New York Times subscription. And you know what? For like the last 10 years, thanks to the New York Times, they said you can have your family members, including ones who don't live with you, live off your subscription. So my son has had a free subscription to the New York Times effectively because he has my credentials. And it's not like Netflix. They don't like that. They told me I can do that. I have their authorization to do that. So I have nobody to give this coupon to who I couldn't already give the New York Times to on my subscription. It's just crazy to think that that is worth cash. But people are paying, you know, we use it as analog. What are people paying on the open market? People are paying the New York Times on a monthly basis this amount of money for access to that product. It's the current market price. Now, with respect to whether or not do I not want any of this and like all the points you're just making, you had the option to file a claim to get cash here. And if you didn't avail yourself to it and sat by and literally did nothing, then you got this code that you may or may not be happy with. But that doesn't make it a coupon. Why don't we hear from the New York Times? Thank you very much. Thank you. Thank you. I think that's as far as it goes. Good morning. May it please the Court. Kristen Rodriguez on behalf of Defendant Appleby of the New York Times. Your Honors, regardless of how this Court comes out on the question of whether or not the access codes are coupons, and regardless of how this Court comes out on the fee award, this Court should affirm the District Court's approval of the settlement for at least two reasons. First, this settlement, particularly in light of the risks that were faced in litigation here, this settlement was undeniably fair, adequate, and reasonable. And the District Court did the appropriate analysis to come to that conclusion. And second, the structure of the settlement would allow the Court to affirm the approval of the settlement. Could I ask a question about that first point? Because I think that's very important. Yes. Before the amendment of Rule 23, I think what most judges did, what I did when I was a district judge, is exactly what you said. I look at the settlement. I say, well, the plaintiffs don't have a very good claim. So the fact that the settlement doesn't really amount to very much for the class is it may even be considered a generous settlement, at least if you value the coupons at face value. So that's okay. Now I look at the attorney's fee and see is that fair. And they're only asking for 22 percent, which seems a reasonable amount, and so done and done. The problem, it seems to me, is that, as Mr. Isaacson points out, now the amount of the fee and the reasonableness of the fee is a part of evaluating the settlement. And I think I understand why Congress did that or why the Rules Committee did that originally and Congress let it go through, is that if we're worried about the possibility of collusion or of the class lawyers sort of selling out the class, whether they're getting a disproportionate amount of the value is worrisome. And that's why the Rules Committee, I think, and you can correct me if I'm wrong or you think I'm wrong, included the fairness of the attorney's fee as a factor in evaluating the underlying fairness. Now, that's something like a paraphrase of or an extension of Mr. Isaacson's argument about why the district court applied the wrong standard in the first place, because it didn't factor the fee in. Why is he wrong about that? Because he's wrong about that because the court did consider the fee in making the analysis. The court methodically went through all of the factors that are in 23E, as well as in Grinnell, and found that with all of the risks that were faced, as well as the fee, as well as the reaction of the class, all of the factors that are required, it still nonetheless was a fair settlement. Yes, but of course you started this appropriately given how much trouble your friend had with me anyway. I don't know about the other, my colleagues. You start quite reasonably with the idea that even if it's a coupon, then it's still a fair settlement. But if it's a coupon, then it's not a reasonable fee anymore, it seems to me. And if it's not a reasonable fee anymore because it's actually an illegally excessive fee because it doesn't limit the amount that – it doesn't base the fee on the coupons that are redeemed, then we have an unreasonable fee. And now we're feeding an unreasonable fee, not a reasonable one, back into the analysis of is it a fair settlement. But that particular element, Your Honor, goes to the relief provided for the class is adequate. So even if this court were to find that the fee is somehow inflated because it is the result of an improper calculation under CAFA, that only means that the class will receive more for those who elected to receive cash. Yeah, but doesn't that run into the provision in 23E2D about whether the members of the class are actually treated equitably vis-a-vis each other? Now, Ms. Bridegson is worried about even what Judge Jacobs calls a tip, a tip that a waiter would sneer at calculated as a percentage of the fee, the incentive awards. But is it really equitable to say, without making some full disclosure to the class, you can take the coupon by doing nothing, and that gets you one free month of the New York Times worth X dollars, or at least some piece of the New York Times. Or you can take the cash, which I think – didn't the notice say we estimate it will come out to some number? Yes, it did. But actually, if the fee gets drastically cut, then the cash to be divided up between those who thought, eh, $20 or whatever it was in the notice is a good deal, are suddenly getting a windfall, while the people who opted for something that I assume, if we think that the options are equitable as between all the class members, how come some people are going to come away with maybe $1,000 and other people are coming away with a coupon that they probably don't want, and that even at face value is worth nothing like that? Doesn't that change one's view of the equity of the settlement? No, Your Honor, for two reasons. First of all, in the notice, we very clearly laid out that the potential cash recovery would be pro rata, based on the number of people who elected to do the cash offer, as well as the amount of the fees that would ultimately be awarded to counsel. And we explicitly noted that the attorney's award may be less than what they have requested. This is a common factor that happens in all types of class action settlements when there is the potential of a pro rata recovery that depends on the fees. And so it's not a windfall. It is not a bonanza. It is what explicitly was contemplated, depending on what the court decides on the fees. So it is not unfair, because the class was put very much on notice that this could, in fact, happen. Moreover, my second response to that was that the court contemplate that, though, when it approved the fairness of the settlement, because the court, I think, was basically assuming that the, you know, again, trying to put myself in the position of the district judge, even if I'm deciding the fairness of the settlement first and the fee later, if I have no special reason to think that the fee is going to be anything other than or at least in the ballpark of what's been settled, I haven't actually thought about how fair the settlement is if we are operating in a CAFA world in which maybe the attorney's fee, and I'm still not sure how this is going to work out, on Mr. Isaacson's rolling attorney's fee, how do you ever decide what's left in the $1.6 million to be divvied up among the cash claimants? The whole settlement seems to be very weird if you don't give the attorney's fee, whether it's high or low, decide the dollars at the time you're deciding, close the books on this, divvy up whatever cash is left after the attorneys get their cut, have a claims administrator do the math and send the checks, and we're done. That doesn't seem like what's going to happen under CAFA if we decide that this is a coupon settlement. You see what I'm saying, what the problem is? We don't even know. We'll never know maybe what the actual amount left after the attorneys get theirs to be divided up if we have to wait and see how many coupons get redeemed. Well, that goes to why these may not be actually coupons because there is not a specific expiration period that has been set here, and it creates the concern that you're saying here, but that doesn't impact ultimately the fairness here and whether the court abused its discretion in determining that the settlement was fair because she considered all of the factors. It is not some blinders that the court put on. That is not a fair review of the record and what Judge Abrams did here. She certainly considered that factor, and she certainly went through all of the factors in both Grinnell and in 23E2 in determining whether or not this was a fair settlement. And I would like to remind the court what this underlying case is all about. This was not about some fraudulent hidden scheme. This was not about some exploding microwave or other defective product. This was about a claimed violation under the California automatic renewal statute where the Times was alleged to have not complied with certain technical requirements under that statute, such as the size of the font. The Times told you that you were going to, by signing up, you were going to have a perpetual renewal until you stopped. It's just a question of was it in red or black, was it in big print or not, was it close to the button that you pushed to say yes or further away. Correct. And so there's that. Correct. And millions of dollars later, here we are. So you started out, I think it was probably wise to say, even if this is a coupon, then we can split this. So we would remand that to Judge Abrams, I think it was. Yes. And let her deal with CAFA and the termination of the attorney's fees award, but then approve or affirm the settlement. Yes, Your Honor. Yes. That's correct. And I would point, Your Honor, to other cases that we have cited in our briefing where the court did exactly that. For example, the Easy Saver case, where the court found Easy Saver, where the court found that there were, in fact, coupons at issue there, but the remainder of the settlement was viable and affirmed on the settlement. And we would submit that's what this court should do if it is at all inclined to find that the access codes are coupons. Thank you, Your Honors. Thank you very much, Your Honor. Could you focus on what was just said? What was just said with respect to? Being able to divvy this up, in other words, remand it back. Because it sounds like the coupon issue is your central issue, but maybe I've misunderstood. I think the coupon issue is a central issue, yes. Yes, Your Honor. I think that attorney's fees can be paid over a period of many years, even decades. There was tobacco class action litigation that was settled in a huge omnibus settlement. The attorney's fees are being paid over 20 or 30 years. I get quarterly payments on that case. My wife tells me that I should expect them to end this year or next. But then the problem is how do we know how much the cash payments get? That's exactly right. Here, I think New York Times Counsel said that there's no expiration date on the coupons. In fact, the coupons have an expiration date in this case 50 years out, as though somebody 35 or 47 years from now might be going through their old e-mail and say, oh, look, I have a coupon for New York Times, a one-month subscription. I think that's unrealistic. As a practical matter, they don't have an expiration date. But, you know, the structure of the settlement creates a problem. You don't know what the fees are going to be from the coupons. Odds are that it's going to be extremely low. Has this happened? I mean, I've never had to deal with this before as a district court judge, as Judge Lynch and Judge Parker have. But hasn't this happened before somewhere in the country where the calculation of the coupons being redeemed has occurred? It may be that it's happened before, Your Honor, but there are not many people who put the time and money and effort into filing objections to settlements. And if they file objections and they're overruled, there are not a lot of people who are interested in developing the law, as I am, who will fly across the country in a case that's dealing with a California class to make objections and to make arguments before the Second Circuit Court of Appeals. So there may be cases out there. I don't think they've resulted in published appellate precedents. I suppose there is also the option of a fee that's based on the lodestar. Is that not an alternative? I think an unenhanced lodestar or a very modestly enhanced lodestar might be an option and would particularly think that it's important to focus on what the New York Times has spoken of as being a very, very weak case. Perhaps it's a frivolous case. You don't want to encourage lawyers to file frivolous or extremely weak cases in order to get four times their reasonable hourly rate. That's a perverse incentive structure and is, I think, contrary to public policy. I'd be happy to answer any further questions you have. I see my time has run. Thank you. Thank you very much. Thank you very much, Your Honors.